# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 23, 2011 Session

## CORIN MUCHA WILKINSON v. THOMAS GREGG WILKINSON

**Appeal from the Circuit Court for Davidson County**
**No. 08D-2770      Carol Soloman, Judge**

**No. M2010-01974-COA-R3-CV - Filed November 29, 2011**

This case concerns the divorce of Thomas Gregg Wilkinson ("Husband") and Corin Mucha Wilkinson ("Wife"). Wife filed for divorce in the Circuit Court for Davidson County ("the Trial Court"). The Trial Court, in its final decree granting the divorce, *inter alia*, divided the marital estate and awarded Wife alimony. Husband appeals, contesting the division of the marital estate, the award of alimony to Wife, the award of attorney's fees to Wife, and a judgment against him for pendente lite support arrearages. We modify the judgment of the Trial Court as it relates to the Trial Court's marital debt allocation/alimony in solido and the amount of arrearages Husband owes. Otherwise, we affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, in Part, and Modified, in Part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

James L. Weatherly, Jr., Nashville, Tennessee, for the appellant, Thomas Gregg Wilkinson.

Grant C. Glassford, Brentwood, Tennessee, for the appellee, Corin Mucha Wilkinson.

## OPINION

## Background

Wife filed for divorce in October 2008. In December 2008, the Trial Court ordered Husband to pay Wife $5,400 per month in interim support. This support was confirmed by the Trial Court in January 2009. Husband filed a Motion to Reduce, Suspend, or Eliminate Pendente Lite Support in December 2009. In an order, the Trial Court stated that it would defer ruling on Husband's motion until the final hearing in this case. This case was tried over the course of two days in April 2010 and one day in July 2010.

Wife testified first and stated that she was 59 years old. Wife graduated from Rosemont College in 1976 with a degree in art history. She worked at a training program at a department store and later at the Academy of Natural Sciences in Philadelphia. Wife married Husband in 1979. Subsequently, Wife quit her job. Husband and Wife had two daughters born in the 1980s. Wife was the primary caregiver for the children when they were young. She testified that both of her daughters attended a private school, Harpeth Hall, and then Wake Forest University. Wife testified that she tried to obtain a teaching certificate but because Husband stated that he would not pay for it, Wife did not obtain the certificate. Wife stated that she also tried to obtain a real estate license but received a "[f]lat no" from Husband. Wife stated that she attempted to obtain a degree in psychology but Husband would not agree to that either. Her most recent job was as a substitute teacher. Wife earned $80 dollars per day as a substitute teacher and worked as a substitute teacher about 15 days in the year prior to trial.

Wife testified regarding Husband's status as breadwinner over the course of the marriage:

Well, he went to a private school. He went to Haverford College, which is referred to as the "mini Harvard." He was an economics major.

He worked for the DuPont Corporation, which was a Fortune 500 company. He worked for a series of very, very good corporations that were high paying.

Wife testified that Husband informed her in September 2008 that he had vacated the marital home. Wife had traveled to Connecticut to visit her mother. Husband told Wife in a telephone conversation that he had left the home. Wife testified that she did not know this was going to happen. For her financial support in the subsequent period, Wife's brother loaned her $75,000 over the course of 2009 and 2010. Wife's mother had

-2-

loaned her $92,393.30 beginning in 2004.

Wife stated that she was diagnosed with breast cancer in October 2008. Wife had surgery related to the cancer in November 2008, and was undergoing a five-year course of medication to address the cancer. Wife also testified that she was "osteopenia", had thyroid problems, and that her cholesterol was over 300.

Wife claimed that her living expenses amounted to approximately $7,500 per month. Wife alleged that Husband had "tak[en] up with all these women and squander[ed] money." Wife acknowledged that she, too, had sexual relations outside of her marriage in December 2009.

Wife testified to her efforts to find employment, in addition to her work as a substitute teacher. Wife stated that she has "very limited skills." As Wife put it: "No one's really hiring in this culture, particularly nonprofits and low-end retail. It's a very bad climate, and I have no experience. I do not bring very much to the party." Wife stated that she had "made an enormous effort and it's been quite humiliating."

Husband testified next. Husband was 58 years old as of the last day of trial. Husband started working at DuPont in 1979 and worked there for about eight years. Husband and his family moved to Nashville from Delaware in 1986 or 1987. In the 1990s, Husband began working for a company called PGI. PGI manufactured diaper components and operating room gown and drape fabrics. Husband's original salary at PGI was in the range of $120,000 per year with bonuses. At the time of Husband's departure from PGI in 1999, his annual pay was around $275,000. Husband stated that he left PGI because, in his capacity as "senior revenue person", he refused to provide what he considered to be inaccurate forecasts for the company. PGI provided Husband with a severance package valued at $1,000,000 to be paid in increments of $200,000 over the course of five years. Husband also signed a noncompete agreement with PGI.

PGI bankrupted and the payments to Husband stopped two and a half years later. Meanwhile, an internet-based venture that Husband had moved to also collapsed. Regarding the series of financial problems, Husband stated:

> So I went from making close to $300,000 a year to making zero over, literally, six weeks. So it was - - to me, I was terrified. I mean, all of a sudden I've got $20,000-a-month cash demands between the house and, you know, the education, and my income is zero. So I was - - I was very, very scared.

Husband then went to China to pursue business opportunities there. Husband

-3-

drew down on his 401(k) account to help with the family finances. Husband testified that he advised Wife that their lifestyle had to change as a result of their new financial situation. Husband stated that Wife insisted on maintaining their previous standard of living. Husband testified that in 2007, at Wife's insistence, his daughter, Carolyn, had an expensive wedding that cost $60,000. After his 401(k) account was drained, the pair sold the family's home on Golf Club Lane. The pair moved into a house in Whitworth. Husband testified that Wife spent at least $100,000 on interior design for the new house against his wishes.

Husband acknowledged that he developed a sexual relationship with Sharon Wang while in China. Husband spent time, off and on, in China on business from around 2002 to around 2006. Initially, Husband's relationship with Ms. Wang was of a business nature. Their relationship, however, turned personal after six or eight months of the two working together. Husband paid for Ms. Wang's tuition, room and board at a Chinese university. According to Husband, he spent, at most, $6,000 in relation to Ms. Wang.

At the time of trial, Husband lived in Florida with his girlfriend, Amelia Best. Husband pays Ms. Best cash for his part of the rent when he has the funds. Husband makes use of Ms. Best's car. Husband had been working on a four month contract with a business, Baxley, at $3,000 per month. That work ended in June of 2010. Husband testified that he had given his resume to companies in the three months prior to the last day of trial. Husband stated that he took medication, though not daily, to slow his heart rate.

After the trial, the Trial Court entered its order. The Trial Court granted Wife a divorce on the basis of Husband's adultery and inappropriate marital conduct. Husband was ordered to pay Wife $800 per month in alimony in futuro. The Trial Court also found that Husband in the future potentially could have the capacity to pay Wife $5,400 per month. Husband was to file an affidavit detailing his earnings every 90 days. Husband's motion to modify the pendente lite support was denied, and he was ordered to pay a total of $66,800 in arrearages for unpaid pendente lite payments from 2009 and 2010. The Trial Court divided marital debts and assets thusly:

19. The Court further finds that Wife shall have exclusive possession and occupancy of the former marital residence located at 85 Victoria Park, Nashville, Tennessee.

20. The Court finds that Wife shall continue to market and attempt to sell the former marital residence.

21. The Court finds that until the house sells, Wife shall be responsible for two-thirds (2/3) of the monthly mortgage, and Husband shall

be responsible for one-third (1/3) of the monthly mortgage.

22. The Court further finds that any expenditures necessary to repair the home as determined by the realtor will also be divided two-thirds (2/3) to Wife and one-third (1/3) to Husband.

23. The Court further finds and ORDERS that Husband shall receive thirty-three percent (33%) of the equity realized from the sale of the marital residence, and Wife shall receive sixty-seven percent (67%) of the equity realized from the sale of the marital residence.

24. The Court further finds that Husband is awarded all personal property in his possession.

25. The Court finds that Wife is awarded all items of personal property in her possession, except that within a reasonable time Husband shall be entitled to retrieve the following items of personal property: fold out couch, coffee table, portrait, and two metal filing cabinets.

26. The Court further ORDERS Husband to immediately return to Wife the four (4) place settings and the two (2) candelabras that he removed from the marital residence.

27. The Court further finds and ORDERS that Wife be awarded any stock in her name and the contents of her lock box.

28. The Court further finds and ORDERS that Wife is entitled to claim the mortgage interest deduction for 2009 and in all subsequent years until the marital residence sells.

29. The Court further finds and ORDERS that Husband is required to pay as alimony *in solido* Seventy-Five Thousand Dollars ($75,000) to Thomas Mucha as reflected in the two Promissory Notes (Trial Exhibit 6). The Court further finds and ORDERS that Husband shall pay Wife Five Hundred Dollars ($500) per month towards these promissory notes. It is further the ORDER of the Court that his first payment shall be due on July 21, 2011 and shall continue at the rate of Five Hundred Dollars ($500) per month thereafter.

30. The Court finds and ORDERS that as a division of marital

property, Husband shall reimburse Wife for the following:

     A.   Capital One account - $25,613.03

     B.   Whitworth Homeowners Association outstanding fees - $1,125.66

     C.   Saint Thomas Hospital - $6,004.55

     D.   Baptist Hospital - $96.95

31.   The [sic] finds and ORDERS that Thirty-Three Thousand One Hundred Ninety-Two & 63/100 Dollars ($33,192.63) for these and other unpaid bills shall be deducted from Husband's portion of the proceeds realized from the sale of the marital residence and tendered to Wife. It is further the ORDER of the Court that Wife is awarded a lien in the amount of $33,192.63 against Husband's portion of equity realized from the sale of the former marital residence.

32.   The Court further finds and ORDERS that Husband will pay all debts in his name including the tax liability, if any, owed for any years the parties filed tax returns together.

33.   The Court further finds and ORDERS and Wife will pay all debts in her name.

34.   The Court further finds and ORDERS that the Court costs shall be taxed against Husband, for which execution may issue if necessary.

The Trial Court also awarded Wife's attorney, Grant C. Glassford, an attorney's fees lien against 85 Victoria Park for unpaid legal fees of $7,495. The Trial Court further awarded Wife, as alimony in solido, a judgment of $30,982.68 for attorney's fees incurred in the case. Husband was to pay, as part of his monthly alimony in futuro payment, $100 per month towards the attorney's fees judgment. Husband appeals.

## Discussion

Though not stated exactly as such, Husband raises four issues on appeal: 1) whether the Trial Court erred in its division of the assets and debts of the marital estate; whether the Trial Court erred in its award of alimony to Wife; 3) whether the Trial Court erred in awarding Wife attorney's fees and expenses; and, 4) whether the Trial Court erred

-6-

in awarding a judgment of $66,800 against Husband for pendente lite arrearages.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

The issues we address in this appeal are ones related to the discretion of the Trial Court. In *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Supreme Court discussed the abuse of discretion standard at length, stating:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

> Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel.*

*Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

We first address whether the Trial Court erred in its division of the assets and debts of the marital estate. Courts must look to Tenn. Code Ann. § 36-4-121 when determining how to distribute property in a divorce. In pertinent part, Tenn. Code Ann. § 36-4-121 provides:

(b) For purposes of this chapter:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing . . .

\* \* \*

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills,

-8-

employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties. . . .

Tenn. Code Ann. § 36-4-121 (2010).

A trial court has wide discretion in dividing the interest of the parties in marital property. *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1991). As noted by this Court in *King v. King*, when dividing marital property:

The trial court's goal in every divorce case is to divide the

parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown*, 913 S.W.2d [163] at 168. . . . In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990).

*King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 Tenn. App. LEXIS 100, at *11-12 (Tenn. Ct. App. Feb. 9, 1998), *no appl. perm. appeal filed)*.

We find the division of the marital estate in this case to be generally equitable. The Trial Court, however, assigned Husband the $75,000 debt that Wife incurred as a loan in that amount from her brother. Husband's obligation on this debt was characterized as "alimony in solido" by the Trial Court. The Trial Court also ordered Husband to pay $66,800 in arrearages stemming from his failure to pay support in accordance with the pendente lite support order. Whether the allocation of this $75,000 debt is part of the property division or is alimony in solido, we hold that this outcome results in an unwarranted double payment by Husband for Wife's support while this divorce matter was pending.

The evidence in the record before us is overwhelming that during the pendency of this divorce proceeding, Husband and Wife had insufficient income and assets even to begin to approach the standard on which they had lived for many years. Husband's income had decreased both suddenly and dramatically. The parties had depleted Husband's 401(k) and Wife had borrowed from her mother to maintain their family's standard of living even before the divorce was filed. The parties' pre-divorce lifestyle was financed, in part, by Husband's 401(k) and borrowed money. Despite this lack of income or assets sufficient to maintain their pre-divorce filing lifestyle, Wife attempted to maintain the same lifestyle level while the divorce was pending.

Whether classified as part of the property division or as alimony in solido, the Trial Court erred in assigning this $75,000 debt to Husband. We modify the Trial Court's judgment to hold that Wife is responsible for the $75,000 debt to her brother as this borrowed $75,000 was used by Wife, in addition to Wife's alimony pendente lite, to maintain her standard of living at a level far beyond the income and assets then available to the parties. We are aware that Husband ceased making the alimony pendente lite payments for a period

of time prior to the divorce. The Trial Court, however, awarded arrearages against Husband for his unpaid alimony pendente lite. As discussed later in this Opinion, Wife has a judgment against Husband for his alimony pendente lite arrearages based upon an amount Husband had the ability to pay at that time.

Husband argues that Wife's extravagance in spending weighs against Husband's earning capacity as a factor for the allocation of the remaining debts and assets. We disagree. We observe that the Trial Court stated concerning Husband's credibility: "[H]e leaves some credibility hanging out there, and I'm not so sure he put it in his pocket. He's difficult to swallow and to believe." We afford great deference to the Trial Court's witness credibility determinations. After a careful and thorough review of the record, and mindful of the relevant statutory factors, we find no error, apart from the allocation to Husband either as alimony in solido or as part of the property division of the $75,000 debt to Wife's brother, in the division of the marital estate as it otherwise is an overall equitable division.

We next address whether the Trial Court erred in its award of periodic alimony. Trial courts have broad discretion to determine whether alimony is needed and, if so, the nature, amount, and duration of support. *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). As pertinent to this issue, Tenn. Code Ann. § 36-5-121 provides:

> (d)(1) The court may award rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, or alimony in solido, also known as lump sum alimony or a combination of these, as provided in this subsection (d).
> (2) It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.
> (3) Where there is relative economic disadvantage and rehabilitation is not feasible, in consideration of all relevant factors, including those set out in subsection (i), the court may grant an order for payment of support and maintenance on a long-term basis or until death or remarriage of the recipient, except as otherwise provided in subdivision (f)(2)(B).
> (4) An award of alimony in futuro may be made, either in addition to an award of rehabilitative alimony, where a spouse may be only partially

rehabilitated, or instead of an award of rehabilitative alimony, where rehabilitation is not feasible. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

* * *

(f)(1) Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

* * *

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor

-12-

child of the marriage;

 (7) The separate assets of each party, both real and personal, tangible and intangible;

 (8) The provisions made with regard to the marital property, as defined in § 36-4-121;

 (9) The standard of living of the parties established during the marriage;

 (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

 (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

 (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.…

Tenn. Code Ann. §36-5-121 (2010).

"There are no hard and fast rules for spousal support decisions." *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998). Decisions regarding alimony require a careful balancing of the factors in Tenn. Code Ann. § 36-5-121(i) and typically hinge on the unique facts and circumstances of the case. *Anderton*, 988 S.W.2d at 683. While all of the statutory factors are significant, the two most important factors are the obligor spouse's ability to pay and the need of the disadvantaged spouse. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

We are unable to conclude that the Trial Court abused its discretion with either the amount or type of alimony awarded, other than as to the $75,000 debt owed to Wife's brother. The record clearly establishes that Wife is economically disadvantaged compared to Husband. The evidence shows that Wife relied on Husband for support over the course of the marriage. Wife's job prospects are negligible given her state of health and lack of experience. From the record, it is apparent to us that neither Husband nor Wife likely will be able to replicate any time soon the standard of living enjoyed during much of their marriage. As we have discussed, Wife's minimal work history and her past financial reliance on Husband, largely at Husband's insistence during most of the marriage, essentially precludes her from independently attaining either the parties' prior marital or Husband's post divorce standard of living. While the record suggests that Husband may well regain some measure of his past financial success, he was searching unsuccessfully for employment at trial's end. Nevertheless, the amount of $800 per month in alimony to be paid by Husband is reasonable in light of all of the circumstances. The Trial Court did not abuse its discretion in awarding Wife alimony in futuro in this amount.

We next address whether the Trial Court erred in awarding Wife her attorney's fees and expenses. An award of alimony in solido for payment of attorney fees should be based on the factors set forth in Tenn. Code Ann. § 36-5-121(i), and is appropriate when the spouse seeking attorney fees does not have adequate funds to pay his or her legal expenses. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002). Conversely, a spouse with sufficient property or income to pay his or her attorney fees is not entitled to be compensated. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000).

In the case before us, several factors weigh in favor of the Trial Court's decision to award Wife attorney's fees. Though neither party is in a state of financial strength, Wife's poor employment prospects, long absence from full-time employment, and extended bout with cancer and other health issues support awarding her attorney's fees. We also note that the $100 per month that Husband is required to pay on this obligation is not onerous given his employment history and relative good health. We find no error in the Trial Court's award of attorney's fees to Wife.

Finally, we address whether the Trial Court erred in awarding a judgment of $66,800 against Husband for pendente lite support arrearages. Husband testified that he earned $3,000 per month, plus expenses, on a four month contract in 2010 that had ended by the time of trial. For pendente lite support prior to trial, Husband was ordered to pay Wife $5,400 per month. Husband had filed a Motion to Reduce, Suspend, or Eliminate Pendente Lite Support in December 2009. The Trial Court deferred ruling on this Motion until the final hearing in this matter. At that time, the Trial Court denied Husband's Motion. In its final decree, the Trial Court ordered Husband to pay Wife $800 per month in periodic alimony.

We find this gross disparity in Husband's alimony payment obligations pre-divorce and post-divorce unwarranted in terms of Husband's ability to pay from the time he filed his Motion to Reduce, Suspend, or Eliminate Pendente Lite Support up through the time the Trial Court entered its final decree of divorce. Notwithstanding Husband's past successful years of employment, during the relevant period of time during which Husband was ordered to pay pendente lite support, the record simply does not support a finding that Husband realistically had the ability to pay Wife $5,400 per month.

Husband's ability to pay alimony was not substantially greater for the period from December 2009 until the entry of the Trial Court's final judgment than it was at the date of the final judgment. We believe the appropriate amount of pendente lite support due is best set at the same amount the Trial Court ultimately set for Husband to pay as alimony in futuro, $800 per month. For this reason, we believe the Trial Court erred in not granting Husband's Motion and should have modified his pendente lite support award to $800 per month. We,

however, believe it is appropriate that this modification of the pendente lite be effective as of December 2009 when Husband filed his motion to modify the pendente lite support order. Husband's pendente lite obligation remains at $5,400 per month through November 2009 and drops to $800 per month starting December 2009. Based on the 15 month period over 2009 and 2010 which served as the basis for the Trial Court's judgment for arrearages, and, crediting Husband for $4,000 for support payments in 2010 as did the Trial Court, we modify the judgment for arrearages from $66,800 to $35,400.

Wife asks that we award her attorney fees on appeal. In the exercise of our discretion in light of the evidence and all relevant factors, we decline to award either party attorney's fees on appeal.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and, modified, in part, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Thomas Gregg Wilkinson, and his surety, if any, and one-half against the appellee, Corin Mucha Wilkinson.

_____
D. MICHAEL SWINEY, JUDGE